SHORTRIDGE v. MASON. See Case No. 12,812.

SHORTSLEEVES (STEAM STONE CUTTER CO. v.). See Case No. 13,334.

---

## Case No. 12,813.

### The SHORT STAPLE.

[1 Gall. 104.] [1]

Circuit Court, D. Massachusetts. May Term, 1812. [2]

NON-INTERCOURSE—SPECIAL DEFENCE—BURDEN OF PROOF—STATUTES—RETURN CARGO—EVIDENCE.

1. Where the claimants set up a special defence against a forfeiture, the onus probandi lies on them; and if such defence be not satisfactorily made out, condemnation will go. A registered vessel is within the prohibitions of the 3d section of the act of 9 January, 1808, c. 8 [2 Stat. 453]. That section was not repealed by the 19th section of the act of 1st March, 1809, c. 91 [9 Laws (Weightman's Ed.) 255; 2 Stat. 533], or 2d section of the act of 28th June, 1809, c. 9 [10 Laws (Weightman's Ed.) 14; 2 Stat. 550].

[Cited in The Ocean Bride, Case No. 10,404; U. S. v. 129 Packages, Id. 15,941; Boxes of Opium v. U. S., 23 Fed. 392.]

2. Under the 3d section of the act of 9th January, 1808, c. 8, the return cargo is not affected with forfeiture.

3. Strong presumptive circumstances of fraud will outweigh positive testimony against it.

[Cited in The Ocean Bride, Case No. 10,404.]

[Appeal from the district court of the United States for the district of Massachusetts.]

In admiralty.

G. Blake, for the United States.

Wm. Prescott and R. G. Amory, for claimants.

STORY, Circuit Justice. The libel in this case contains several counts; but two only are relied on, viz. 1. That the brig departed from the port of Baltimore, and proceeded to a foreign port, viz. Cape Nicholas Mole, in the island of St. Domingo, contrary to the 3d section of the act of 9th January, 1808, c. 8. 2. That the brig at the port of Cape Nicholas Mole aforesaid, traded with divers goods and merchandizes, constituting her original outward cargo, and received on board and traded with a return cargo of salt, contrary to the same section. The facts stated in these counts are admitted to be proved, and the ground assumed in the claim and defence is, that the brig was compelled to proceed to the Mole, in consequence of a hostile capture by a British armed cutter, and there disposed of her

---

[3] [From Abb. U. S. 58.]

[1] [Reported by John Gallison, Esq.]

[2] [Reversed in 9 Cranch (13 U. S.) 55.]

outward cargo, and being there released, was permitted to go to Turks Island, where a cargo of salt was taken in, with which she returned to the United States.

The facts appear to be these: In the month of August, 1808, a British armed cutter called the Ino, arrived in Boston, and remained there until about the 25th of the ensuing October, when she cleared out for the Cape of Good Hope, with a crew of twelve men on board, including the passengers, and with provisions for such a voyage. The cutter was armed with about ten guns, and appears to have been regularly commissioned. The owner was on board, but she was commanded by another person. On the 4th of October, the brig Short Staple (which is a registered vessel) cleared out from Boston for Baltimore, and on the 11th of the same month, the brig William King cleared out from Boston for the same port, and both brigs safely arrived, and after taking on board full cargoes of flour, and receiving a clearance, went down to Hampton Roads for the ostensible purpose of proceeding to Boston about the 1st of the following November. The brigs were here detained about seven days, as is alleged, by head winds. While the brigs were lying in Hampton Roads, and about five or six days before their sailing therefrom, the Ino arrived in the Roads, for the ostensible purpose of refitting her boom, which was said to be carried away by a gale of wind. While lying there, the owner of the Ino and the masters of the two brigs appear to have been, at times, on shore at Norfolk; but there is no evidence that they were seen together. On the morning of the 8th of November, the brigs sailed from the Roads, and the Ino also; and in the afternoon of the same day, about ten leagues from the shore, the Ino brought them to by firing guns, and sent a prize master and one or two hands on board, and took possession of them, and directed their course first for Jamaica, and afterwards for Cape Nicholas Mole, in St. Domingo. During the voyage the Ino and the brigs kept company together, until they were overhauled by a British ship of war, and the Ino then took the prize masters and others of her crew out of the brigs, and stood away to the windward, in order, as it is said, to avoid the impressment of her crew. The brigs were searched by the ship of war and suffered to proceed; and on the next day, or the day after, arrived safe at the Mole, where they found the Ino, which had not been in company with them after the parting at the time of their being searched by the ship of war. The Short Staple here landed her cargo, which was sold for a high price, viz. $35 per barrel of flour, to the black government, and was abandoned altogether by the Ino, which sailed immediately afterwards in company with the William King for Jamaica. When off

Kingston, the owner of the Ino went on board the William King, and proceeded with her into port, and there abandoned the prize without instituting any proceedings in the admiralty. After discharging her cargo, and leaving her mate at the Mole for the purpose of receiving the proceeds of the sales, the Short Staple proceeded from thence to Turks Island, took on board a cargo of salt, and returned therewith to the United States.

Such are the facts found stated in the depositions in the case, which have indeed been not a little clouded by evidence of the confessions of several of the witnesses. But it is not necessary nicely to sift the evidence, because my decree will be founded on other views.

The story here told is indeed a very extraordinary one, and yet is supported by positive direct testimony. It is certainly the duty of the court not lightly to suspect the truth of statements, clothed with the solemn sanctions of an oath, and supported by numerous concurring witnesses. But testimony, however positive, must in its nature be liable to control by strong presumptive circumstances, and must be weighed with care, when it comes loaded with the temptations of private interest, and the impressions of personal penalties. It is a melancholy consideration for the court, that in the discharge of public duty, it finds itself often obliged to resist the influence of human declarations, and to rely upon the concurrence of probable circumstances.

In the present case the claimant [Elisha Hathaway] admits, that the brig proceeded to a foreign port and there disposed of her cargo. It therefore becomes incumbent on him to make out a justification in point of fact, as well as law. The onus probandi rests on him, and a forfeiture must be pronounced, unless he brings the defence clear of any reasonable doubt. See Ten Hogsheads of Rum [Case No. 13,830]. Now there are many circumstances in this case, which have a tendency to excite strong suspicions and doubts.

1. The privateer had but a small complement of men; she had been in Boston, while the brigs lay there, about two months; and she followed rapidly on their course, when they departed. She professed a destination for the Cape of Good Hope, which, though attempted to be explained, when connected with her subsequent conduct, is not quite satisfactory.

2. The pretence alleged for capture was utterly vain and illusive. It was that French property was on board, or that the brigs were bound to French West India Islands. The cargo was flour, notoriously of our own production. The papers were all regular, and indeed do not seem to have been examined at all. The capture, on account of alleged destination to French West India Islands, was wholly frivolous, for such a trade was

not, as to foreign nations, illegal. The capture was made in or near our own waters. No effort was made to confine or govern the crews: two men were taken out of each brig, and no more: the masters remained on board, and the whole crew of the privateer does not seem to have equalled that of the brigs.

3. When the British ship of war was met, the prize masters seem to have been removed, to avoid impressment. No persons were left on board to control the course or conduct of the vessels. The masters were at full liberty to proceed to any port they pleased, for the prizes, as such, were completely abandoned: yet they proceeded to the Cape.

4. If the capture were really hostile, it is inconceivable that the brigs should not have been carried directly to some British port, for search and condemnation. This is the usual, nay, I had almost said, the invariable course. But here one brig is abandoned at the Mole, without further examination or process, and the other is abandoned at Jamaica with as little ceremony. The cargoes of the vessels were very valuable. It is almost a settled usage to decree costs in the admiralty courts to the captors, upon the slightest pretence; and there was therefore the strongest reasons to tempt the captors to a trial. No legal advice of the king's attorney appears to have been taken. Yet notwithstanding all these circumstances, showing that the capture, if real, was a most flagrant wrong, the captain and owner are found as witnesses in the cause, and volunteers to prove their own unworthy conduct; nay more, the privateer, when this testimony is given, is herself within our own ports enjoying the protection of government.

These are some of the circumstances which carry to my mind strong impressions against the reality of the capture; I must therefore consider it an amicable arrangement, in which a good market, and not a good prize, was the primary intent of the parties. But it is said, that if, on the facts, the court are of opinion, that the defence is not made out, yet condemnation ought not to go, because no forfeiture is incurred under the 3d section of the act of the 9th of January, 1808, c. 8, unless a vessel proceed to a foreign port or place contrary to that act, or the act to which that act is a supplement. And it is argued, that such proceeding to a foreign port by a registered vessel is not contrary to either of these acts. The original act lays an embargo on all ships and vessels within the ports of the United States bound to any foreign port, and prohibits registered vessels from departing with cargoes from one port to another of the United States, unless bonds be given to reland the cargo in the United States. But this act contained no provisions applicable to licensed vessels, and therefore, by the 1st and 2d sections of the supplementary act, the legislature prohibited coasting and fishing vessels, from departing from

one port to another of the United States, unless bonds were given "not to proceed to any foreign port," but to reland their cargo in the United States. Then comes the 3d section, which in effect declares, that if any ship or vessel shall, contrary to the provisions of either of these acts, proceed to a foreign port or place, such ship or vessel shall be forfeited. It is certainly true, that the provisions of the other sections of the supplementary act are not applicable to registered vessels. It is however admitted by the counsel for the claimants, that licensed vessels, proceeding to a foreign port, would be liable to forfeiture by the 3d section, because the condition of their bond is, not to proceed to a foreign port. But it is argued, that no such provision is found in the bond to be given by a registered vessel, the condition of which simply requires a relanding of the cargo in the United States. But even as to licensed vessels, there is certainly no direct prohibition in the act against their proceeding to a foreign port. It is a mere inference from the apparent intent of the legislature. If therefore we are to imply such a prohibition, as to licensed vessels, we must certainly imply the same as to registered vessels, when they have proceeded to a foreign port, and have not relanded their cargo in the United States. For in such case (which happens to be the present), it is proceeding to a foreign port, contrary to the condition of the bond. In illustration of the argument of the counsel of the claimant, it has been said, that if a registered vessel proceed to a foreign port, and afterwards reland her cargo in the United States, it is no forfeiture of the condition of the bond. Now admitting this to be true, it does not follow that no offence is committed. It would be unlawful for such vessel to depart without a clearance, but such departure would certainly not amount to a forfeiture of the bond, if any were given.

But it strikes me very clearly, that the 1st section of the embargo act, with few exceptions, prohibits all voyages to foreign ports. It places a restraining interdict on all ships, and prohibits the granting of any clearance for such ports. How then can we say, that it is not contrary to that act, to proceed to a foreign port? The departure of registered vessels is not allowed generally, but only from port to port of the United States. If therefore they departed under color of a coasting voyage really bound for a foreign port, it must be as much a violation of the embargo, as though they departed for such foreign port, without giving bonds.

The supreme court of the United States condemned the Eliza (7 Cranch [11 U. S.] 113) for the same offence, although I am well satisfied, that she was a registered vessel. The Paulina (7 Cranch [11 U. S.] 52) was a registered vessel, and the whole reasoning of the court in that case evidently proceeds on this ground. It is true, in neither case

was the point brought before the court. But these causes were very ably argued and well considered, and if there had been any solidity in the objection, I feel some confidence, that it would not have escaped the attention both of the bar and the court.

It has also been slightly argued, that the section on which this prosecution is founded, is to all intents and purposes repealed, and if so, no condemnation can pass against the property. On examining the 19th section of the act of 1st March, 1809, c. 91, [9 Laws (Weightman's Ed.) 255; 2 Stat. 533], and section 2 of the act of 28th June, 1809, c. 9, [10 Laws (Weightman's Ed.) 14; 2 Stat. 550], I am satisfied, that nothing can be taken by this objection. The Short Staple must therefore be condemned. But the attorney for the United States contends, that under the last count in the libel, viz. the trading at Turks Island, the cargo of salt is also forfeited by the 3d section of the act of 9th January, 1808, c. 8. Now the trading alleged in that section must be contrary to that act, or the act to which that is a supplement. But I know of no provisions in either of those acts, which make it illegal to trade with a foreign cargo which had not been previously carried from the United States. The mere traffic in foreign commodities is not an offence; it must be such traffic carried on by an illegal exportation from the United States. In my judgment, therefore, the cargo is not subject to forfeiture.

On the whole I affirm the decree of the district court with costs.

[NOTE. This cause was carried by writ of error to the supreme court, where the sentence of this court condemning the Short Staple was reversed and annulled, and the cause remanded, with directions to decree a restoration of the vessel to the claimants, and to dismiss the bill. 9 Cranch (13 U. S.) 55.]